IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 4:23-CR-00075 |
| v. | (Chief Judge Brann) |
| ELIJAH GAMON, | |
| Defendant. | |

## MEMORANDUM OPINION

### JUNE 25, 2025

## I.    BACKGROUND

On March 23, 2023, a grand jury sitting in the Middle District of Pennsylvania returned a one-count indictment against Elijah Gamon, charging him with Possession with Intent to Distribute a Controlled Substance in violation of Title 21, United States Code § 841(a)(1).[1] Gamon eventually filed a Motion to Suppress Evidence on January 6, 2025.[2] The Court held an evidentiary hearing on that motion on May 13, 2025 and allowed the parties to submit additional briefing.[3] As the Court is now in receipt of this briefing, the motion is ripe for disposition. For the reasons that follow, it is denied.

---

[1]    Indictment, Doc. 1.
[2]    Motion to Suppress, Doc. 35.
[3]    Scheduling Ord., Doc. 40; Briefing Ord., Doc. 45.

## II.    FACTUAL BACKGROUND

### A.    The Professional Backgrounds of the Officers

#### 1.    Eric Dreisbach

Eric Dreisbach has been a Pennsylvania State Police ("PSP") Trooper since January 2014; he was initially in the patrol unit but transferred to the Bureau of Criminal Investigation's Drug Law Enforcement Shield Unit in 2020.[4] The Shield Unit is Pennsylvania's "full-time interdiction unit."[5] These officers conduct traffic stops to "look for indicators of criminal activity . . ."[6]

Since graduating the State Policy Academy, Dreisbach has received "approximately 400 hours of advanced training in criminal interdiction, the Shield class, money laundering, [and] hidden compartment training."[7] He has also completed approximately 300 to 400 traffic stops that have led to the recovery of narcotics.[8]

#### 2.    Christopher Isbitski and K-9 Diego

Christopher Isbitski has served with the PSP for nine-and-a-half years, with approximately five years spent as a K-9 handler.[9] At the time of the relevant events,

---

[4]    Evidentiary Hearing Transcript, Doc. 46 at 9:12-19.
[5]    *Id.* at 9:21-22.
[6]    *Id.* at 9:22-10:2.
[7]    *Id.* at 10:8-11.
[8]    *Id.* at 10:12-15.
[9]    *Id.* at 47:24-48:5. Prior to working as a K-9 handler, Isbitski served in the Troop F Milton patrol unit. *Id.* at 48:6-8.

Isbitski had been K-9 Diego's handler for approximately two years.[10] During his time at the State Police Academy's handler school, Isbitski first trained with "three different dogs that rotated" and then eventually completed his training with his assigned dog, Diego.[11] As a drug dog, Diego is trained to detect cocaine, methamphetamine, marijuana, and heroin.[12] Now, Isbitski and Diego attend K-9 training "[t]ypically two days a month."[13]

### 3.    Jeremy Hoy

Jeremy Hoy has been a PSP trooper for "just over 20 years," and he has been assigned to the Shield Unit since July 2013.[14] During this time, he has made several thousand car stops, and Hoy estimated he has searched "well over a hundred" vehicles.[15] He has never searched a vehicle for a suspected bomb or other explosive device.[16]

## B.    The Events of December 18, 2022

### 1.    The Initial Chase

On December 18, 2022, Dreisbach was in an unmarked patrol vehicle equipped with an MVR camera watching traffic near mile marker 213 along

---

[10]  *Id.* at 50:2-4.
[11]  *Id.* at 49:17-20. There are three types of K-9s: (1) cadaver dogs; (2) explosives dogs; and (3) drug dogs. *Id.* 48:18-20. Each dog has just one discipline. *Id.* at 48:24-25.
[12]  *Id.* at 51:19-22.
[13]  *Id.* at 50:7-13.
[14]  *Id.* at 57:22-58:3.
[15]  *Id.* at 58:6-13.
[16]  *Id.* at 58:14-15.

Interstate 80.[17] At approximately 12:24 p.m., Dreisbach observed a Jeep Cherokee traveling westbound; he ran the "license plate through Clean NCIC, and [he] observed that the registered owner, Elijah Gamon, was DUI-suspended."[18] Dreisbach's search of the database also revealed that Gamon was the vehicle's sole registered owner and it provided him with a copy of Gamon's driver's license picture.[19] Dreisbach concluded that Gamon was "similar in appearance" to the black male in the license photograph.[20]

When Gamon's vehicle passed, Dreisbach pulled out and began a pursuit, noting that Defendant quickly "gain[ed] considerable distance" from him.[21] Dreisbach then activated his emergency lights,[22] and it eventually became apparent to Dreisbach that Gamon was fleeing when he "went down [an] off ramp and immediately blew the stop sign and went right back up the ramp to I-180."[23]

As he pursued Gamon, Dreisbach reviewed "headers" of investigations into Defendant through PSP's "mobile data terminal."[24] Through this, he discovered

---

17  *Id.* at 11:3-10.
18  *Id.* at 11:17-21. Clean NCIC is the PSP's system used to access certain information about individuals such as their vehicle registration, "records checks," and warrants. *Id.* at 12:6-8.
19  *Id.* at 12:16-18.
20  *Id.* at 38:21-24.
21  *Id.* at 13:7-16.
22  *Id.* 13:16-21.
23  *Id.* at 13:24-14:2.
24  *Id.* at 14:20-24, 15:8-9.

Gamon "had a fleeing and eluding with possession with intent to deliver from the year prior."[25]

Defendant eventually "abruptly" exited the interstate "at the last second."[26] He took the exit "at an extreme high rate of speed" and struck a large sign after he drove through an intersection "into the far shoulder" of the road.[27] When he hit the sign, Gamon "disabled or blew out his front left tire."[28]

Remarkably, the high-speed pursuit continued now along Route 220, with Gamon driving still at "70, 80 miles per hour, even without that front left tire."[29] He recklessly weaved in and out of traffic and "almost hit numerous vehicles head on."[30] Gamon eventually ran through an intersection, in the process "almost" striking a pedestrian, and proceeded down a side road.[31] He lost control of the vehicle and struck a tree head-on after briefly being airborne.[32]

### 2.    The Aftermath of the Crash

Dreisbach exited his "patrol vehicle with [his] firearm drawn" and then "approached his vehicle from the driver's side [and] tried to give [Defendant]

---

[25]  *Id.* at 15:12-13.
[26]  *Id.* at 16:1-3.
[27]  *Id.* at 16:22-25.
[28]  *Id.* at 17:1-5.
[29]  *Id.* at 17:10-14.
[30]  *Id.*
[31]  *Id.* at 18:7-12.
[32]  *Id.*

commands."[33] "It was very smokey inside; the airbags went off. It was hard to see."[34] Given the severity of the accident, Dreisbach attempted to open the locked driver's side and passenger side doors.[35] He then began "trying to smash the driver's side window out" with his Asp baton.[36]

"[A]t this point, [he was] in now life-saving measures."[37] Upon managing to open the driver's side door, Dreisbach removed Gamon from the vehicle.[38] "He was semi-unconscious, mumbling, not really saying anything."[39] Dreisbach also feared the vehicle would catch fire as it was smoking.[40]

Dreisbach "put [Gamon] on his back on the ground" and handcuffed him.[41] A bystander, off-duty paramedic approached the scene and "started assisting [Dreisbach] with treating" Gamon.[42] The paramedic "asked [Dreisbach] if [he] had a blanket or anything to keep [Gamon] warm."[43] Dreisbach then "tried to find something to cover him with" and eventually "popped the rear hatch area and located

---

[33] *Id.* at 18:17-21.
[34] *Id.* at 18:20-21.
[35] *Id.* at 18:22-24.
[36] *Id.* at 18:25-19:1.
[37] *Id.* at 19:9.
[38] *Id.* at 19:9-13.
[39] *Id.*
[40] *Id.*
[41] *Id.* at 19:14-15.
[42] *Id.* at 19:14-18.
[43] *Id.* at 20:2-3.

. . . a black jacket that [he] brough out and put on him or laid on him."[44] He also "briefly" looked in the driver area to see if he could find something for Gamon.[45]

At the end of the video, Dreisbach stated he intends to "have the dog run the car," referring to Isbitski doing an exterior sweep of the vehicle with K-9 Diego.[46] Several reasons prompted Dreisbach to do so, including the "pretty extreme pursuit[;]" "[h]is prior history with the fleeing and eluding, possession with intent to deliver case[;]" and his "other criminal history related to possession with intent to deliver."[47] Once Isbitski arrived at the scene, he performed "an exterior search of the vehicle" by walking Diego around "the complete outside of the vehicle."[48] During this sweep, Diego alerted on the vehicle "several times."[49] Hoy was also present when Isbitski performed this exterior sweep.[50]

### 3.    The Surgical Mask

At the suppression hearing, Dreisbach described for the Court the interior of Gamon's vehicle in the driver's side area. He said "it was a mess" as the airbags had gone off, "[t]here was smoke and dust everywhere" and "[e]verything in the car kind of got strewn around from the crash."[51] "The only thing [he] observed of interest"

---

[44]  *Id.* at 20:5-8.
[45]  *Id.* at 20:11-13.
[46]  *Id.* at 23:20-24:1.
[47]  *Id.* at 24:4-10.
[48]  *Id.* at 51:5-18.
[49]  *Id.* at 52:3, 14.
[50]  *Id.* at 64:1-3.
[51]  *Id.* at 25:13-16.

was a mask "wrapped in . . . a ball on the driver's side area."[52] He simply "noted that . . . for later," but relayed that information to Hoy.[53]

He did so because, while still at the scene of the accident, Dreisbach reviewed additional information about Gamon's prior charge of possession with intent to deliver and related fleeing and eluding from an incident on October 6, 2021.[54] This revealed that Gamon "was in a police chase" due to excessive speeding in a construction zone; the PSP "initiated a pursuit" of a leased BMW vehicle, but the "vehicle was ultimately able to evade during the pursuit."[55] "Gamon was later taken into custody when he showed up at the BMW dealer with the vehicle . . . ."[56] In connection with that case, the PSP recovered narcotics that Dreisbach described as "wrapped up in a glove" in one of Gamon's pockets.[57]

The PSP General Offense Report for the October 6, 2021 incident stated, in relevant part: "I then emptied GAMON'S pockets and searched him in order to transport him to PSP Montoursville for an interview. I found a blue/purple latex rubber glove in GAMON'S left front pants pocket which appeared to have drugs in

---

[52] *Id.* at 25:19-21.
[53] *Id.* at 26:1-10.
[54] *Id.* at 26:15-23.
[55] *Id.* at 27:1-8.
[56] *Id.*
[57] *Id.* at 27:18-20.

it."[58] Dreisbach assumed that for the glove to contain drugs, it was "going to be somewhat balled-up . . . ."[59]

Although Dreisbach informed Hoy of this, he did not know at that time that the charges related to the October 6, 2021 incident had been dismissed.[60] Dreisbach did not learn this until "at least a week or so after" December 18, 2022,[61] but eventually came to understand that the October 6, 2021 incident charges were dismissed due to an issue with identifying the driver of the relevant vehicle.[62] Hoy similarly was unaware of the disposition of this fleeing and eluding charge at the time he applied for the search warrant.[63]

Further, Hoy independently observed the surgical mask. He could see the surgical mask "from outside of the vehicle" as it was "in plain sight."[64] "It was folded and wrapped tightly to look like a small cylinder."[65] He observed this mask "[t]hrough the window on the driver's side" "more than an hour after the accident."[66] At the hearing, Hoy explained that he had "never seen a mask wrapped in that manner without looking like it was . . . concealing something."[67] But he also

---

[58]   20211014 PSP Report_GO 2021-1349308, D-105.
[59]   Doc. 46 at 45:14-17.
[60]   *Id.* at 28:13-16.
[61]   *Id.* at 34:20-22.
[62]   *Id.* at 34:23-35:4.
[63]   *Id.* at 61:2-14.
[64]   *Id.* at 68:3-9.
[65]   *Id.*
[66]   *Id.* at 84:1-85:2.
[67]   *Id.* at 85:23-25.

acknowledged that he had never encountered contraband being concealed in a surgical mask before.[68]

### 4.    Hoy is Made the Investigating Officer

It was "at least an hour-and-a-half to two hours after arriving on scene" that Hoy was informed he would be the investigating officer.[69] At that point, Hoy could no longer have contact with Dreisbach outside the presence of counsel,[70] as the PSP had initiated a procedure to investigate the incident given the severity of the crash. Dreisbach was later cleared of any wrongdoing,[71] but Hoy acknowledged that this inability to communicate with Dreisbach "hamstrung" his investigation as he was not "able to clarify anything that he had previously told" Hoy.[72]

As the investigating officer, Hoy also performed a search of Gamon's criminal history once he returned to a PSP station.[73] Hoy clarified that criminal history is broad and "include[s] whatever he was charged with."[74] Again, Hoy emphasized that he did not know the outcome of these cases forming Gamon's criminal history at the time he applied for the search warrant.[75]

---

[68]    *Id.* at 85:17-20.
[69]    *Id.* at 62:10-13.
[70]    *Id.* at 62:16-19.
[71]    *Id.* at 63:2-6.
[72]    *Id.* at 63:16-21.
[73]    *Id.* at 76:10-12.
[74]    *Id.* at 81:17-25.
[75]    *Id.* at 83:22-24.

### 5.    Hoy's Prior Affidavit of Probable Cause

Finally, at the hearing, the Government questioned Hoy about an affidavit of probable cause that he prepared and submitted six months prior to the one he prepared in this case.[76] In that prior affidavit, Hoy wrote:

> Upon arrival by Trooper Isbitski and K-9 Diego, they conducted an exterior scan of the vehicle. During the K-9 scan, the K-9 displayed alert behaviors near the front of the vehicle indicating that an odor or combination of odors that the K-9 is trained to detect was present. K-9 Diego is trained to detect the odors of Marijuana, Cocaine, Heroin, and Methamphetamine and their derivatives.[77]

## III.    ANALYSIS

### A.    Gamon Fails to Make the Requisite *Franks* Showing

The Supreme Court of the United States "determined that a criminal defendant has the right to challenge the truthfulness of factual statements made in an affidavit of probable cause supporting a warrant subsequent to the ex parte issuance of the warrant."[78] In *Franks v. Delaware*, the Supreme Court "created a mechanism to allow a defendant to overcome the general presumption that an affidavit of probable cause supporting a search warrant is valid."[79] "First, the defendant must make a 'substantial preliminary showing' that the affidavit contained a false statement, which was made knowingly or with reckless disregard for the truth, which is material

---

[76]  *Id.* at 71:24-72:6.
[77]  *Id.* at 72:25-73:6.
[78]  *United States v. Yusuf*, 461 F.3d 374, 383 (3d Cir. 2006).
[79]  *Id.*

to the finding of probable cause."[80] "At the hearing, the defendant must ultimately prove by a preponderance of the evidence that: (1) the affiant knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that created a falsehood in applying for a warrant; and (2) that such statements or omissions were material, or necessary, to the probable cause determination."[81]

In *Wilson v. Russo*, the United States Court of Appeals for the Third Circuit "set forth standards to identify what constitutes 'reckless disregard for the truth' regarding both misstatements and omissions:[82]

> In evaluating a claim that an officer both asserted and omitted facts with reckless disregard for the truth, we hold that: (1) omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would want to know; and (2) assertions are made with reckless disregard for the truth when an officer has obvious reasons to doubt the truth of what he or she is asserting.[83]

"When faced with an affirmative misrepresentation, the court is required to excise the false statement from the affidavit."[84] "In contrast, when faced with an omission, the court must remove the 'falsehood created by an omission by supplying the omitted information to the original affidavit.'"[85]

---

[80]   *Id.*
[81]   *Id.* (citing *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)).
[82]   *Id.*
[83]   *Wilson v. Russo*, 212 F.3d 781, 783 (3d Cir. 2000).
[84]   *Yusuf*, 461 F.3d at 384.
[85]   *Id.*

"In the end, the defendant must prove by a preponderance of the evidence that probable cause does not exist under the corrected affidavit," meaning "that the deficiency in the affidavit was material to the original probable cause finding."[86] Despite his best efforts, Gamon fails to do so; consequently, the Court does not decide whether Defendant has demonstrated that Hoy acted with reckless disregard for the truth.

Before the affidavit can be reconstructed, the Court must first determine what statements and omissions the corrected affidavit should address. Gamon's post-hearing argument encompasses both a false statement and an omission. But his purported omission does not meet the *Franks* standard.

As the Third Circuit explained in *Wilson v. Russo*, "omissions are made with reckless disregard if an officer [(1)] withholds a fact in his ken [(2)] that 'any reasonable person would have known that this was the kind of thing the judge would wish to know.'"[87] While the ultimate disposition of the charges that comprise Gamon's criminal history may be something a "judge would wish to know[,]" these facts were not within Dreisbach's or Hoy's "ken" at the time the affidavit was prepared.[88] Both explicitly testified that they learned of the disposition of the charges stemming from the October 6, 2021 incident after the submission of the search

---

[86]  *Id.* at 383.
[87]  *Wilson*, 212 F.3da t 788 (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)).
[88]  *Id.*

warrant application.[89] As a result, Gamon has failed to demonstrate that this information was improperly omitted from the affidavit of probable cause.[90]

### 1.    The Corrected Affidavit

The Court will now recreate the relevant portions of the corrected affidavit.[91] Before I do so, I note that the Court received no guidance from the parties on how to revise the affidavit. Although it is a tedious task, this is an undoubtedly critical step in the *Franks* analysis. Any revisions implemented to cure the affidavit may significantly alter whether probable cause exists. Engagement on this question would have focused the minds of the parties on the operative issues and assisted the Court. With that in mind, the recreated affidavit of probable cause reads as follows:

> On 12/18/22, just prior to 1224 hours, Tpr. Eric DREISBACH was on stationary patrol on interstate 80 at mile marker 213, 1, W. Turbot Twp., Northumberland Co., observing west bound traffic in an unmarked patrol vehicle. At this time, he observed a black Jeep Cherokee pass his location bearing PA registration, MBK4818. A license plate query revealed that the registered owner (Elijah Gamon) had a DUI Suspended driver's license. Tpr. DREISBACH believed the operator of the vehicle appeared similar in appearance to the registered owner.

> At this time, Tpr. DREISBACH pulled from his stationary position and traveled west on Interstate 80 after the black Jeep. Tpr. DREISBACH observed the vehicle exit I-80 onto Interstate 180 west at a high rate of

---

[89]  Doc. 46 at 28:13-16, 34:20-22, 61:9-14.

[90]  Even if Gamon could succeed on this argument, revising the affidavit to include the omitted information, namely the disposition of these cases, would not sufficiently alter the Court's analysis such that the revised affidavit would lack probable cause.

[91]  The relevant purportedly false statement is excised through a bolded strikethrough. Excluded from the Court's recreation of the affidavit of probable cause are Hoy's professional background and his general knowledge concerning drug traffickers. These areas are unaffected by the necessary revisions.

speed. As Tpr. DREISBACH approached Exit 5, he activated his lights and siren. The vehicle exited at Exit 5, drove straight through the intersection at the bottom of the exit ramp and back onto I-180 west.

With Tpr. DREISBACH in pursuit, the operator traveled at speeds over 100 MPH and passed several vehicles on the berm of the highway.

The black Jeep exited the Interstate at Exit 15. The Jeep proceeded through the intersection at a high rate of speed, unable to make the right turn onto US 220 North, drove onto the far berm of the roadway, then left the roadway and drove through a road sign. This caused a flat left front tire. The Jeep then proceeded North on US 220, at speeds of approximately 70 MPH, driving in the oncoming lane towards numerous other vehicles, passing vehicles on turns and crests of hills.

The Jeep then proceeded through the intersection of Race St. and SR 405 (Main St.), partially in the incoming lane. At this point, just missing a pedestrian who had just crossed the street to the north side of Race St. The Jeep continued at a high rate of speed on Race St. and attempted tot run right onto N. 5th St. (Hughesville Boro, Lycoming Co.), but failed to negotiate the turn and struck the concrete curb. The vehicle became airborn and struck a tree. Tpr. DREISBACH extricated the driver, identified as the registered owner of the vehicle, Elijah GAMON.

GAMON has an extensive criminal history to include, but not limited to, Motor Vehicle Theft, Robbery, Weapons violations, Possession with Intent to Deliver, recent Fleeing and Eluding (each time coinciding with Drug charges). Visible on the driver's side front floorboard is a surgical mask wrapped tightly as to appear that it is concealing possible contraband. During an October 2021 pursuit, he was found to have contraband **similarly packaged**. Due to the fact that GAMON fled from Tpr. DREISBACH, his extensive criminal history, and the package visible in the vehicle, Tpr. ISBITSKI of the Pennsylvania State Police K-9 Unit was contacted. Tpr. ISBITSKI had K-9 Diego perform an exterior scan of the vehicle. K-9 Diego alerted to the odors he is trained to detect.

Based on my training and experience, and totality of the incident, your AFFIANT believes that GAMON was involved in criminal activity. Based on the information detailed in this affidavit, your AFFIANT

requests that a search warrant be approved, allowing your AFFIANT and other members of the Pennsylvania State Police to search the 2016 Jeep Cherokee bearing PA registration, MKB4818, VIN # 1O4RJFBG2G0433975.

A magistrate judge reviewing this revised affidavit would have the following, relevant information before him: (1) Gamon fled from Trooper Dreisbach, often driving recklessly and at high speeds; (2) Gamon has an extensive criminal history that includes fleeing and eluding that accompanied drug charges; (3) a surgical mask that contained possible contraband was visible on the floor of the Jeep Cherokee; (4) Gamon had previously been found to have contraband during an October 2021 pursuit; and (5) K-9 Diego alerted when he performed an exterior scan of the vehicle. Under these facts, probable cause to search the vehicle clearly existed, and Defendant has therefore failed to make the requisite *Franks* showing.

## B.    Defendant's Remaining Challenges

But the Court's conclusion that the affidavit still provided probable cause rests, in part, on facts that Gamon has separately challenged. I therefore evaluate the sufficiency of the description of the K-9 in the affidavit and determine whether the surgical mask was discovered due to an unjustified, warrantless intrusion into the Jeep Cherokee.

### 1.    The Sufficiency of the Description of K-9 Diego

In the affidavit, Hoy provided only the following information about Isbitski and Diego: "Due to the fact that Gamon fled from Tpr. DREISBACH, his extensive

16

criminal history, and the package visible in the vehicle, Tpr. ISBITSKI of the Pennsylvania State Police K-9 Unit was contacted. Tpr. ISBITSKI had K-9 Diego perform an exterior scan of the vehicle. K-9 Diego alerted to the odors he is trained to detect."[92]

Defendant argues that this "fails to meet" the "very minimum standard" of reliability as the affidavit does not "identify what odors K-9 Diego is trained and certified to detect."[93] But Gamon has cited no caselaw requiring additional details; instead, his cited cases merely indicate that more effusive descriptions are "more than sufficient to establish reliability."[94] Nor can he, as the Third Circuit has previously observed that "requiring a more detailed statement of training and reliability in the affidavit would facilitate the drawing of inferences by a neutral magistrate, [but] the absence of such a statement does not preclude it."[95] In making that observation, the Third Circuit declined to join other circuits that require additional information about a K-9's reliability.[96] "Thus, when the dog sniff is not the only element of probable cause, it is sufficient to identify the police canine by name and identification number, along with its handler by badge number."[97]

---

[92]   Affidavit of Probable Cause, 36-1.
[93]   Reply Brief, Doc. 50.
[94]   *United States v. Otero-Lugo*, 2024 U.S. Dist. LEXIS 145315, at *16 (E.D. Pa. 2024).
[95]   *United States v. Rivera*, 347 F. App'x 833, 839 (3d Cir. 2009).
[96]   *Id.*
[97]   *Id.* at 838.

Examples of sufficient descriptions in other cases reinforces this conclusion. In *United States v. Rivera*, the Third Circuit concluded a bail commissioner could reasonably "infer that Tre, as a member of the K9 unit, had the training and reliability required to detect narcotics"[98] when the affiant had identified suspicious facts leading to the use of the K-9 and the inclusion of both the officer's and K-9's relevant identification numbers. By way of further example, in *United States v. Humphries*, the Honorable Joy Flowers Conti recognized the following identification as "reasonable for the magistrate to infer that this identified law-enforcement K-9 team had the training and reliability required to support probable cause that drugs would be detected in the vehicle[:]" "Allegheny County Sheriff's Deputy Brandon Tuzikow and his partner Fetyls arrived on scene."[99]

Consequently, there is no issue with Hoy's short description of the K-9. The information provided by Hoy, and the alarming circumstances preceding the arrival of the Isbitski and K-9 Diego, would allow a magistrate to infer that the two were adequately trained and reliable. As a result, the Court could properly consider that information when making the probable cause determination under the relevant affidavit.

---

[98]    *United States v. Rivera*, 347 F. App'x 833, 838 (3d Cir. 2009).

[99]    *United States v. Humphries*, 504 F. Supp. 3d 464, 473 (W.D. Pa. 2020). Judge Conti relied on *Rivera*, at least in part, to reach this decision. *Id.*

### 2.    The Warrantless Intrusions into the Jeep Cherokee

Gamon has also challenged the various intrusions into his Jeep Cherokee at the scene of the accident. As the record before the Court on this subject is not a model of clarity, I first summarize the relevant testimony.

### a.    The Relevant Testimony from Dreisbach

On direct examination, Dreisbach responded in the affirmative that "at some point" he was "in the front of the vehicle removing the keys or for other reasons."[100] The Government then asked Dreisbach to describe the inside of the vehicle, to which he indicated "it was a mess" due to the airbags, smoke, dust, and glass.[101] After providing this description, Dreisbach testified that "[t]he only thing [he] observed of interest . . . was . . . a wrapped-up mask . . . ."[102] He clarified it did not hold any significance to him "at that time," but he later informed Hoy about it.[103]

On cross-examination, Dreisbach further noted that he did not "remember the exact moment" he saw the surgical mask.[104] "[I]t was one of those things when [he] actually had time to sit down and look over the report while all of this was going on after the fact, that [he] saw he had that balled-up thing in his pocket from the last incident."[105]

---

[100]  At 25:6-9.
[101]  *Id.* at 25:10-16.
[102]  *Id.* at 25:19-21.
[103]  *Id.* at 26:1-10.
[104]  *Id.* at 44:3.
[105]  *Id.* at 44:3-7.

Finally, Dreisbach indicated that he would not "have had the same advantage that Trooper Hoy would have had later on" after "the scene was cleared and the vehicle moved."[106] He did not know if Hoy "saw through the window, before he typed the search warrant up," the surgical mask "and had a different view of it versus what [Dreisbach] had from that limited time [he] was in the vehicle."[107]

### b.    The Relevant Testimony from Hoy

Hoy testified that he "was able to do an exterior scan . . . of the vehicle, looking for any possible contraband that was visible . . . ."[108] When completing this visual inspection, he "notice[d]" the mask "on the floorboard."[109] He "could see it from the outside of the vehicle" as "[i]t was in plain sight."[110] Hoy indicated this observation occurred "at the scene . . . prior to . . . the tow showing up and it being towed back to the lot."[111] On cross-examination, Hoy clarified that he saw the surgical mask "[t]hrough the window on the driver's side."[112] He further indicated that this observation was made more than an hour after the accident and after Gamon had been removed from the scene.[113]

---

[106] *Id.* at 46:6-11.
[107] *Id.*
[108] *Id.* at 68:3-9.
[109] *Id.*
[110] *Id.*
[111] *Id.* at 68:12-14.
[112] *Id.* at 84:24.
[113] *Id.* at 85:1-5.

### c.    The Testimony Concerning the Remaining Officers

Finally, it is relevant to this analysis to note that Dreisbach testified that the other officers that responded to the accident, even those that looked into the interior of Defendant's vehicle, did not "mention[]" viewing anything in the Jeep Cherokee to either Dreisbach or Hoy at the scene.[114]

### d.    No Issue is Posed by Law Enforcement's Discovery of the Surgical Mask

By the Court's count, the officers intruded into the Jeep Cherokee on nineteen separate occasions.[115] The first fourteen intrusions were justified by the dual emergency circumstances facing Dreisbach and the other responding officers: Gamon's apparent injuries and the smoking vehicle. "An exception to the warrant requirement is when 'the exigencies of the situation make the needs of law enforcement so compelling that [a] warrantless search is objective reasonable under the Fourth Amendment.'"[116] "Such exigencies could include the need to prevent the imminent destruction of evidence in individual cases, to pursue a fleeing suspect, and to assist persons who are seriously injured or are threatened with imminent injury."[117] At the time of the fourteenth entry into the vehicle, Gamon was receiving

---

[114] *Id.* at 43:15-20.
[115] The intrusions occurred at the following timestamps in the MVR video: 11:58, 13:11, 14:30, 14:39, 14:51, 14:55, 15:06, 15:41, 16:25, 16:37, 17:19, 17:28, 18:04, 18:27, 20:06, 20:30, 20:43, 21:35, and 21:45.
[116] *United States v. Beasley*, No. 23-179, 2024 U.S. Dist. LEXIS 191472, 2024 WL 4542050 (W.D. Pa. Oct. 22, 2024) (quoting *Riley v. California*, 573 U.S. 373, 402 (2014)).
[117] *Id.*

medical assistance and Dreisbach is heard making statements that suggest the vehicle was no longer in danger of catching fire.[118] Prior to that, law enforcement was monitoring the vehicle and responding to requests made by a medical professional when entering the Jeep Cherokee.

However, this conclusion does not answer the critical question of when the officers discovered the surgical mask. Dreiscbach could not indicate the precise moment he observed the mask,[119] but the Court concludes, based on the limited testimony before it, that he did so at some point prior to the fourteenth entry into the vehicle. He had testified that the interior of the Jeep Cherokee "was a mess" and that "[t]here was smoke and dust everywhere, pieces of glass."[120] The Government then asked if he observed anything of interest, in response to which Dreisbach identified the surgical mask.[121] This conclusion is bolstered by the Court's observation of Dreisbach's entries through the driver's side door; he performed multiple, full-body entries into the vehicle.[122] Especially when the vehicle first crashed, he seemingly was taking stock of the vehicle and its contents as he searched for additional passengers and evaluated the risk of the Jeep Cherokee catching fire.[123]

---

[118]  Doc. 46 at 18:27.
[119]  *Id.* at 44:3-4.
[120]  *Id.* at 25:13-16.
[121]  *Id.* at 25:13-21.
[122]
[123]

More critically, Hoy explicitly testified that he viewed the surgical mask through the window of the Jeep Cherokee.[124] When "[t]he general public could peer into the interior of" the vehicle "from any number of angles[,]" "there is no reason" to "preclude[]" Hoy "from observing as an officer what would be entirely visible to him as a private citizen."[125] As a result, he had a valid, independent basis for discovering the surgical mask.

Consequently, the discovery of the surgical mask would not infringe upon Gamon's Fourth Amendment interests. The exigent circumstances justified Dreisbach's initial intrusions into the vehicle when he viewed the mask and Hoy merely looked through the car window later in the investigation. Nor can it be said that the remaining five intrusions taint these prior observations such that suppression is warranted.[126]

## IV.    CONCLUSION

After leading the Pennsylvania State Police on a dangerous, lengthy chase that culminated in the violent collision of his vehicle with a tree, Gamon cannot now suppress the contraband discovered in his vehicle. Defendant's Motion to Suppress is therefore denied.

---

[124]  *Id.* at 68:3-9, 84:1-85:2.
[125]  *Tex v. Brown*, 460 U.S. 730, 740 (1983).
[126]  Even if the surgical mask posed an issue, an insufficient causal nexus likely exists between the purportedly improper discovery of the surgical mask and the eventual search of the vehicle and discovery of the contraband.

An appropriate Order follows.

BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge